## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL CASE NO. 18-103-01-TSC |
| | : | |
| v. | : | |
| | : | |
| GINA RITA RUSSELL, | : | |
| | : | |
| Defendant. | : | |

## <u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>

Defendant Gina Rita Russell is a dangerous woman. She is dedicated to exploiting others. Approximately fifteen years ago, she met Hollie Nadel and performed a psychic reading for her. Russell knew full well that she did not have psychic powers, but convinced Nadel that she did. Once she gained Nadel's trust, Russell orchestrated multiple schemes that involved Nadel raising money for Russell and Russell's family. The first involved Nadel lying to her father by claiming she needed money for school, therapy, and expensive sleep studies. The second involved Russell encouraging Nadel to turn to sex work. The third involved Nadel conning her sex work clients into believing she owed money to bad people, i.e., the mafia. Daniel Zancan, one of Nadel's clients, fell for the mafia con hook, line, and sinker. As a result, he ended up embezzling more than $4.2 million from his employer and gave almost all of that money to Russell and her co-conspirator family members. Russell's lifetime of crime finally caught up with her in April 2018 when a federal grand jury indicted her and her co-conspirator family members for the Zancan scam. In the face of overwhelming evidence, she pleaded guilty to interference with interstate commerce by extortion in July 2019. After her guilty plea, Russell continued to engage in egregious criminal conduct, signaling to the Court that she has no genuine remorse for her actions, no respect for the law, and no intention of refraining from crime following whatever sentence is imposed. Her conduct warrants a 151-month sentence.

## FACTUAL BACKGROUND

### I.   THE RUSSELL/EVANS/ KASLOV FAMILY AND HOLLIE NADEL

Gina Russell, Robert Evans, Tony John Evans, Corry Evans, Archie Kaslov, and Candy Evans all were charged in the same indictment in connection with the scheme to get Daniel Zancan to steal money from his employer.[1] Hollie Nadel played an integral role in the scheme.

Nadel met Russell in New York City in approximately October 2009, years before the Zancan scheme started. PSR ¶ 41. When Nadel was going through a vulnerable time in her life, she had the misfortune of bumping into Russell, who offered Nadel a psychic reading. The relationship started as a positive one with Russell providing helpful emotional support. But it transformed into a highly toxic one, which included Russell exercising great influence over Nadel by exploiting Nadel's belief that Russell had psychic powers. Russell told Nadel that bad things would happen to Nadel or her family if money and items were not provided. PSR ¶ 41. At one point, Russell had Nadel beat herself to drive "the demons out which would make her feel better." PSR ¶ 41. Of course, none of the psychic services or spiritual work were true, and all the money that Nadel provided to Russell went to the benefit of Russell and members of her family. PSR ¶ 41.

Nadel eventually served as a personal assistant to Russell and the Evans/Kaslov family, booking their vacations, arranging their transportation, and running their personal errands. She also purchased multiple vehicles for them, including a Bentley GT. PSR ¶ 43. Russell and members of the Evans/Kaslov family have a penchant for the finer things in life but are averse to engaging in honest work, choosing to callously use people instead.

---

[1] Robert Evans is Russell's ex-common-law spouse. Robert Evans' brothers are Tony John Evans and Corry Evans. Archie Kaslov and Candy Evans are the three brothers' parents.

## II.  RUSSELL'S SCAM OF NADEL'S FATHER

Nadel provided Russell and the Evans/Kaslov family with large amounts of money. At first, the funds were from Nadel's lawful jobs. Then she obtained money by defrauding her father. Russell instructed Nadel to tell her father that she needed money for therapy, extensive sleep studies, and university classes. PSR ¶ 44. At one point, Russell directed Nadel to look up the name of a New York therapist so she could reference the therapist while requesting additional money from her dad. Russell arranged for her relative ("Person A") and Nadel to call Nadel's father. During that call, Person A impersonated the therapist in an attempt to get Nadel's father to provide additional money. PSR ¶ 45. Though he did not provide money after that particular call, Nadel's father gave Nadel a significant amount of money as a result of her requests. The money went to Russell and her family. *See* ECF No. 295 at 2-3.

## III.  RUSSELL'S ENCOURAGEMENT THAT NADEL RAISE MONEY THROUGH SEX WORK

Once Nadel's father stopped providing financial assistance to Nadel, Russell and Person A encouraged Nadel to earn more money by using sex to sell herself. PSR ¶ 46. Nadel began to provide sensual massage services through internet websites, including Backpage.com. PSR ¶ 46. Beginning in or about November 2016, in addition to the funds raised from sensual massages and sex work, Russell actively encouraged Nadel to get money, jewelry, and expensive merchandise from her clients by falsely claiming that she was in distress and in physical danger of harm unless she repaid a large debt. PSR ¶ 47, 55(b).

3

### IV.    THE SCHEME TO EXTORT DANIEL ZANCAN AND TO DEFRAUD R&R MECHANICAL CONTRACTORS, INC.

#### A.  General Overview

Just as she had done with numerous other men, Nadel met Zancan through Backpage and engaged in a romantic relationship with him. Zancan ultimately fell in love with her despite being married with kids. Working with Russell and members of the Evans/Kaslov family, Nadel spun tales of distress, physical danger, and financial woe to get Zancan to provide money and valuables to her, which she then provided to the Russell/Evans/Kaslov family.

During her relationship with Zancan, Nadel told him that her father had abused her during her youth and attacked her when she confronted him about the abuse years later. She also said that her father initiated legal proceedings against her and that she had become indebted to unidentified "dangerous" people in New York when paying for legal costs associated with the dispute with her father. She said her friend of many years, Gina Russell, provided her with financial assistance. She also claimed the dangerous people to whom she owed money held her against her will in New York, sometimes for days at a time, and physically assaulted her. She convinced Zancan that these dangerous people posed a grave danger to her.

Russell regularly instructed Nadel what to tell Zancan to explain the regular and increasing demands for money. Robert Evans, Tony John Evans, Corry Evans, and Archie Kaslov handled the logistics of arranging the money and gold drops, and pickups. Tony John Evans pretended to be a mobster during multiple phone conversations with Zancan. PSR ¶ 55(b).

#### B.  Scheme's Specifics

Zancan tried to help Nadel pay off her alleged debt to the purported New York mobsters. He initially provided her about $2,000 or $2,500. Sometime in the beginning of January 2017, per

4

Russell's instructions, Nadel told Zancan that the New York individuals demanded that she pay approximately $100,000. Because Nadel could not make such a payment, she said the New York individuals requested that she pay by providing them two expensive Rolex watches instead. Nadel asked Zancan to help finance the watches, so they traveled together to a high-end jewelry store in Northern Virginia. During their trip, Zancan observed Nadel communicating with the individuals in New York via text message and telephone call. Zancan could not hear the contents of the conversation, but Nadel relayed them to him. Zancan believed Nadel was really being threatened, so he filled out a credit application with the jewelry store and obtained a $10,000 line of credit. Because he only obtained $10,000 in credit, however, he was unable to purchase any watches to assist Nadel with her "payment."

While they were outside the jewelry store, Zancan told Nadel that he could use his employer's funds to make a cash payment to the New York individuals. Nadel claimed that she initially did not want to take the risk of Zancan misappropriating company funds, but then agreed with Zancan's plan. Nadel told the New York individuals, via telephone, that she could not get their payment in cash form. She said they suggested obtaining a cashier's check in her name, cashing the check, and providing them with cash.

On January 11, 2017, Zancan started embezzling funds from his employer. He initiated an approximately $110,000 wire transfer from one of his employer's bank accounts to Nadel's personal Bank of America account. Zancan wired the money believing that Nadel was indebted to mobsters and that her safety was in jeopardy if she did not pay. The following day, Nadel converted the stolen funds into a Bank of America cashier's check payable to herself.

### 1. *Check Cashing*

On January 13, 2017, Nadel traveled from Washington to New York with the cashier's check. Russell enlisted Corry Evans' assistance in getting the check cashed at a PLS Check Cashing store in New York due to his preexisting relationship with the store. Nadel told PLS she was cashing the check to purchase a house. Russell sent Nadel the following messages that day.[2]

| Time (Eastern) | From | Message |
|---|---|---|
| 5:01PM | Russell | Relax while you talk to them don't stutter send him a text telling you what the house looks like |
| 5:01PM | Nadel | Ok thanks |
| 5:01PM | Russell | If you can tell them you're going to go get something to drink next-door because you been in there for hours and while you're outside for two minutes get really a canna Soter and ask him what the house looks like |
| 5:02PM | Russell | If you have time in between call me don't panic this is negativity it's the devil trying to attack you and we will not except it rebuke it in the name of Jesus your powers are coming through |
| 5:36PM | Nadel | All good |

After Nadel cashed the check, Nadel gave the money to Robert Evans and Corry Evans, who took the money to Tony John Evans' residence. The funds were then split among Russell and the Evans/Kaslov family. PSR ¶ 55(f). Robert Evans posted a photograph on Instagram showing money from the cashed check.



---

[2] Although Russell cannot read or write, she can communicate via text message using smartphones that serve as speech synthesizers and that can read text aloud.

On January 14, 2017, i.e., the very next day, and consistent with her insatiable greed, Russell demanded an additional $350,000 from Nadel. PSR ¶ 55(g). As a result, Zancan initiated two separate wire transfers to an account that Nadel had at TD Bank.

On January 19, 2017, Nadel obtained cashier's checks in the amount of $250,000 and $100,000 from her TD Bank account. Nadel also obtained a letter from a TD Bank Assistant Store Manager indicating that she had purchased the two checks from her account, which had a balance of $351,115.96 before the checks were issued. Russell sent several text messages to Corry Evans, including pictures of the checks and the TD Bank letter. PLS was reluctant to cash the checks due to fraud concerns. Thus, it requested additional support.

Over the next several days, Nadel undertook various actions so she could cash the cashier's checks. Russell and Corry Evans instructed Nadel to have Zancan create fraudulent documents explaining why she received large wire transfers. She also—upon the direction of Russell and Corry Evans—created a script of false claims on her phone to get PLS to cash the checks. The digital script included the following notes: "Personal shareholder in the company and consultant," "Cashing out on one of my investments," "Personal consultant for this company," "2-3 weeks to be cleared for me period," "Shopping buy jewelry don't want to have to wait for it to be transferred."

Finally, on January 24, 2017, Nadel successfully cashed the checks at PLS. She immediately provided the cash to Corry Blue Evans, Tony John Evans, and Robert Evans, who accompanied her to the store. Once they had the money, the brothers celebrated. Archie Kaslov drove the brothers to the New York diamond district on 47th Street, where Russell met them.

Kaslov and others then used criminally derived proceeds to purchase watches, including Rolexes. PSR ¶ 55(m).

Tony John Evans recorded two videos capturing the family's joy over having obtained hundreds of thousands of dollars. The family also celebrated by taking pictures. The first photo shows Corry Evans flanked by his father Archie Kaslov and brother Tony John Evans before the checks were cashed. The other one shows cash, coins, and watches after Nadel successfully cashed the checks.

 

### 2. $500,000 Cash Demand, "Tony" the Mobster, & Delivery of the Cash

On January 20, 2017, four days *before* PLS cashed the $350,000 in cashier's checks, Russell, displaying even more greed, demanded an additional $500,000 from Nadel. PSR ¶ 55(j). Given the difficulties in cashing the checks, Russell told Nadel to request payment in cash. Russell told Nadel that Tony John Evans would assist with this demand and that Russell and he discussed having him pose as a mob boss or loan shark named "Tony" to Zancan. That evening, Zancan was driving home from work when he received a telephone call from Nadel, who indicated that "Tony"

wanted to speak with him. Tony Evans was on the line as part of a three-way conversation with Nadel and Zancan. Tony Evans told Zancan that Nadel would not be allowed to leave New York until a $500,000 payment was made. He also told Zancan that he knew where Zancan lived and worked, and where his child went to school. *See* PSR ¶ 55(k). Not surprisingly, when the threats shifted from ones against Nadel to ones against Zancan and his family, including his kids, Zancan was terrified and feared for his safety and the safety of his family. Over the next week, Zancan engaged in a series of fraudulent transactions to raise $500,000.

On January 27, 2017, Zancan drove to New York to deliver the $500,000 in cash, which he had assembled with the assistance of others. Robert Evans arranged the logistics of the $500,000 cash payment. PSR ¶ 55(n). Before Zancan arrived in New York that day, Robert Evans and Nadel rented rooms at the Fairfield Inn Chelsea across from Corry Evans' apartment. PSR ¶ 55 (o). Tony Evans directed Zancan to a specific location in New York. After Zancan stopped at that location,

a member of the Evans/Kaslov family took a photograph of the back of Zancan's vehicle and texted it to Nadel to share with Zancan to create the illusion that Zancan was being surveilled and followed by the mafia. *See* Corry Evans Statement of Offense ¶ 23 (ECF No. 448).[3]



---

[3] It is unclear which member of the Evans/Kaslov family took the photograph, but the record includes evidence that either Robert Evans or Tony Evans most likely took it.

Following the conspirators' surveillance of Zancan, Tony Evans directed Zancan to the Fairfield Inn and instructed Zancan to deliver the $500,000 in cash. Zancan went to the room where Nadel already had checked in. While Zancan was in the room with Nadel delivering the money, Russell tried to call Nadel. The two then engaged in the following text exchange.

| Time (Eastern) | From | Message |
| --- | --- | --- |
| 5:39PM | Nadel | Call you back |
| 5:39PM | Nadel | In the middle of things |
| 5:39PM | Nadel | Can't talk |
| 5:40PM | Russell | What's the name of the hotel that you rented and text me the number for |
| 5:40PM | Russell | Hotel |
| 5:40PM | Nadel | Fairfield inn 1005 |
| 5:40PM | Nadel | In here now getting money |
| 5:40PM | Nadel | With d |
| 5:44PM | Russell | Call me |
| 5:46PM | Nadel | One sec - not alone yet |
| 5:47PM | Russell | Call me 911 stop acting dumb call me now |
| 5:48PM | Russell | Tony's mad you don't to wait for you to have sex he's going to make a plate Holly what are you doing stop acting stupid |
| 6:35PM | Nadel | Going to be with dan in about 20 mins |
| 6:35PM | Nadel | You able to talk for a few mins? |

Once the money was delivered, Tony Evans retrieved the backpack containing the cash and delivered it to his co-conspirator family members. *See* PSR ¶ 55(r).

On January 30, 2017, three days after the large cash drop, Russell, Robert Evans, and their minor daughter were in a hotel room, where video was recorded showing their minor daughter holding bundles of cash. A still shot from the video appears below.



### 3.   *Additional Cash Demands and Invention of More Sinister Mobsters*

The $500,000 cash drop was not the end of the road for Russell and her codefendants. Instead of being content with having received close to a million dollars from Zancan at this point, Russell and her coconspirators kept pressing for more and more money, and created fictional individuals named "Sammie" and "Santino" who were supposedly crueler than "Tony." *See* PSR ¶ 55(w). Zancan was led to believe that "Sammie" and "Santino" were beating, threatening rape, and holding Nadel hostage, all to further terrify and intimidate Zancan into paying.

On or about February 2, 2017, Russell texted Tony Evans images of Zancan's face and of a black handbag containing bundles of cash. Russell made Nadel purchase the black handbag for her and fill it with a payment of between approximately $100,000 and $120,000 Nadel received from Zancan, who believed the payment was for interest on Nadel's outstanding debt. Nadel provided the handbag full of cash to Russell at Tony Evans' apartment. PSR ¶ 55(u).

Undeterred by the psychological turmoil that she and her coconspirators were unleashing on Zancan, Russell remained almost singularly focused on obtaining more money from him. For example, on February 5, 2017, after Nadel demanded additional funds from Zancan at Russell's direction, Nadel told Zancan that he needed to call "Tony" late one night. Russell and Nadel engaged in the following exchange around 3AM. Russell's callous disregard of Zancan's fear is obvious.

| Time (Eastern) | From | Message |
|---|---|---|
| 03:16AM | Russell | Is everything OK |
| 03:16AM | Nadel | No it's not |
| 03:16AM | Russell | What's going on don't let him make any phone calls |
| 03:16AM | Nadel | It's pushing it too far |
| 03:16AM | Nadel | He's freaking out about calling Tony |
| 03:16AM | Nadel | At this hour |
| 03:17AM | Russell | OK so what do you want to do |
| 03:17AM | Nadel | I don't know - trying to calm him down |
| 03:17AM | Russell | Tell him to calm down and not to freak out and to get it together |
| 03:17AM | Nadel | He's sobbing |
| 03:17AM | Russell | Tell him not to cry tell him that you love him very much Tom everything is going to be OK |
| 03:17AM | Russell | Don't worry I have conference he's going to give it to you |
| 03:18AM | Nadel | Telling him |
| 03:18AM | Russell | Tell him that he would rather deal with Tony Tony is more sensible thing to deal with these crazy nut jobs their animals at least Tony is a more sensible person tell him not to be afraid |
| 03:18AM | Nadel | I did but he's afraid of pissing Tony off |
| 03:18AM | Nadel | Calling him 3am before the super bowl |
| 03:19AM | Russell | Tell him not to be worried about pissing Tony off time to be worried about losing you because he's going to lose you forever |
| 03:19AM | Nadel | Ok |

| Time (Eastern) | From | Message |
| --- | --- | --- |
| 03:20AM | Russell | Tell him you feel safer with Tony |
| 03:20AM | Nadel | He knows that |
| 03:21AM | Russell | He's going to do it don't worry |
| 03:23AM | Russell | Tell me you're in danger in that you have no choice |
| 03:23AM | Nadel | I know |
| 03:23AM | Russell | What is he saying |
| 03:23AM | Nadel | Just trying to get him here |
| 03:24AM | Nadel | Faster |
| 03:24AM | Russell | Do you just want to make a three-way line |
| 03:25AM | Russell | Tony only have five minutes you have to hurry |
| 03:25AM | Russell | Tell him that they said they're coming back to get you you don't know when it's going to be your scared |
| 03:56AM | Nadel | You there? |
| 04:35AM | Russell | Tell him that Tony's guy told you that the boss is going to talk to him on Monday |
| 04:35AM | Nadel | Ok |
| 04:35AM | Russell | That they will not disrupt this weekend because this is their biggest weekend of business |
| 04:35AM | Nadel | Ok |
| 04:36AM | Russell | Tell me what he is saying |
| 04:37AM | Nadel | He's concerned about Thur and coming up with it so fast |
| 04:38AM | Russell | Help him |
| 04:38AM | Nadel | I will |

Later that day, Russell asked Nadel how Zancan was doing. When Nadel replied that he was doing better than expected and that they had done good, Russell instructed Nadel to delete her messages and to get a burner phone.

13

| Time (Eastern) | From | Message |
|---|---|---|
| 12:35PM | Russell | How's Dan doing |
| 12:35PM | Nadel | He's doing ok |
| 12:37PM | Russell | K |
| 12:38PM | Nadel | Better than expected thank god |
| 12:38PM | Nadel | We did good |
| 12:38PM | Nadel | Love you |
| 12:39PM | Russell | 😂😂😂love you |
| 12:39PM | Russell | Delete your text messages now all of them from me and run out and get a burner phone |
| 12:40PM | Nadel | Yeah we are both going to get them for the call tomorrow |
| 12:40PM | Nadel | Will do |

### 4.  *$1.9 Million Demand, Gold, & Mardi Gras Vacation*

Later that month, in yet another example of unrestrained greed, Russell instructed Nadel to demand $1.9 million from Zancan. PSR ¶ 55(v). These continuing and growing demands were built on the foundation of Zancan's psychological turmoil and emotional terror and his genuine— but misplaced—love and affection for Hollie Nadel.

Building upon the fear and torment that Russell, Robert Evans, and Tony Evans instigated and perpetuated, on February 17, 2017, Nadel sent a text message to Zancan that "Tony" (i.e., Tony Evans) was ready to talk. Tony Evans, Nadel, and Zancan communicated by three-way cellular telephone call during which Tony Evans informed Zancan that the "juice" on the $1.9 million was 10 percent per month, meaning that Nadel owed 10 percent monthly interest on a $1.9 million debt to the individuals who purportedly threatened harm unless the debt was repaid. After Zancan protested that he could not possibly convert so much money to cash, Tony Evans agreed to accept approximately $1.6 million in gold bars from Zancan. PSR ¶ 55(w).

14

Ten days later, on February 27, 2017, Robert Evans posted the following photograph to his Instagram account showing him and Russell on a plane. He captioned the post, "just landed ready to party."



He also posted the following photographs showing Russell and him in New Orleans for Mardi Gras.

 

The same day that Russell and Robert Evans went to New Orleans, Russell and Nadel engaged in a chat regarding Zancan giving Nadel an engagement ring.

| Time (Eastern) | From | Message |
|---|---|---|
| 08:48PM | Nadel | Back at hotel with dan now for the night |
| 08:48PM | Nadel | He bought a ring |
| 08:48PM | Russell | Omg |
| 08:48PM | Russell | Terri puts me pictures every worry I want to see you please look at the ring is it |
| 08:48PM | Nadel |  |
| 08:48PM | Nadel | I know |
| 08:48PM | Russell | How many carrots is it |
| 08:49PM | Nadel | I think he said 1 |
| 08:49PM | Nadel | Carrot |
| 08:49PM | Nadel | In center and 1 on band? |
| 08:49PM | Nadel | So 2 total? |
| 08:49PM | Nadel | Does that make sense |
| 08:49PM | Russell | Where did he get it |

| Time (Eastern) | From | Message |
|---|---|---|
| 08:50PM | Nadel | 47th street I think |
| 08:50PM | Russell | And didn't get the time ask you what ring size you are if you know that the time |
| 08:50PM | Nadel | He asked me earlier remember? |
| 08:50PM | Nadel | I said I thought 4.5 and it was right |
| 08:51PM | Nadel | He took a chance |
| 08:51PM | Russell | Who asked you earlier |
| 08:52PM | Russell | Remember don't fall in love and get too emotionally attached he only is doing this because you are emotionally supporting him |
| 08:52PM | Nadel | I know |
| 08:52PM | Nadel | I'm not I promised |
| 08:52PM | Nadel | Promise |
| 08:52PM | Nadel | Playing the part right now but I know the difference |
| 08:53PM | Russell | K Love you but make sure I don't fall into the park |
| 08:53PM | Nadel | Love you I won't |
| 08:54PM | Russell | We need to talk about this because he's probably not going to go home mountains and I want to be with you |
| 08:54PM | Russell | You have to tell him that he has to go home to his babies |
| 08:54PM | Nadel | Tonight? |
| 08:54PM | Russell | Let them spend the night with you and then let them go home |
| 08:54PM | Nadel | When |
| 08:55PM | Russell | And you can't wear that ring when you're working you'll get stolen |
| 08:55PM | Nadel | Because he told her he wasn't coming home tonight - he told her he was going home tomorrow |
| 08:55PM | Nadel | Of course not |
| 08:55PM | Russell | K good |

Russell proceeded to encourage Nadel to spend the night with Zancan and have sex with him.

17

On March 11, 2017, Robert Evans posted a photograph on Instagram with a caption about celebrating someone's birthday in Times Square. Tony Evans, Robert Evans, and Russell are all in the photograph.



On or about March 23, 2017, Zancan used his employer's funds to purchase gold from a host of gold dealers. A couple days later, on Saturday, March 25, 2017, he drove to New York and delivered the gold bars by dropping off luggage containing the gold in a New York hotel room that Nadel had checked into. Tony Evans retrieved the gold and delivered it to his co-defendants. *See* Tony Evans Statement of Offense ¶ 14(ss) (ECF No. 74).

Zancan believed this was the final required payment, that he had secured Nadel's freedom, and that she would be released on Monday morning. As a result, Zancan planned to leave New York at approximately 3:00AM on Monday, March 27, 2017, to drive to his workplace, where approximately $80,000 in gold bars that he purchased was scheduled to be delivered. He planned to convert the gold to cash and use it to get away with Nadel after she was released.

### 5. *More Depraved Psychological Turmoil & Additional Demands*

On Monday, March 27, 2017, consistent with his plan, Zancan drove from New York to Washington, picked up the gold, and drove back to New York. During the drive, however, Nadel told him that some sort of turf war had broken out, that "Tony" had been shot by "Santino," and that the individuals in New York were not letting her leave. When Zancan arrived in New York, he exchanged the approximately $80,000 of gold for cash. Nadel told him that the individuals in

New York were demanding an additional $50,000 in "protection" money before they released her. Thus, that evening, Zancan met Nadel at a Starbucks near Times Square and gave her $50,000 in cash. Nadel left with the cash and returned approximately thirty minutes later without it. Zancan and she were then "allowed" to leave New York, but Nadel was instructed to remain in the Washington area.

Zancan and Nadel drove to a hotel in the Baltimore area and spent the night there. Russell, posing as "Sammy P.," one of the mobsters allegedly more dangerous than "Tony," sent several text messages to Nadel, including the following. Nadel shared the texts with Zancan, which simply heightened his fear.

> What the fuck is going on?! What are you two jerk offs hiding? Why is Dan's phone off line? Hollie, Tony could be dying because of you, so if you think your gonna leave and not listen to my instructions you piece of shit, not only will you not be safe from Santino who could find you fucking anywhere and is desperate for you, but I will personally make sure you feel Tony's pain times twenty. Honestly I would fucking enjoy torturing you, after all the fucking drama you have caused you fucking jinx. I was trying to do right by my uncle and that's the only fucking reason I'm even making any sort of deal.

### 6.  Arrests of Zancan & Nadel and Additional Travel by Russell

The same day that Russell sent that text message, Zancan left Baltimore and drove towards Texas, where he hoped to pick up fraudulent identification documents that he and Nadel could use to escape. When Zancan did not report for work and his employer noticed the financial irregularities with the company's account, law enforcement started investigating the case.

On April 4, 2017, after the FBI interviewed Nadel, Russell and she got married per the directions of Candy Evans for the purpose of creating a purported spousal privilege that would keep Nadel from testifying against Russell in the future.

On April 6, 2017, Zancan was arrested.

On April 8, 2017, per Candy Evans' instructions, Russell and Nadel signed a confession that implicated only them and falsely exonerated other members of the Evans/Kaslov family.

Later that month, Russell and Candy Evans instructed Nadel to lie to the FBI during an upcoming meeting at the U.S. Attorney's Office in Washington. Indeed, Nadel lied at the meeting.

Several months later, Russell and Robert Evans enjoyed another trip. Instead of New Orleans, this time they went to San Francisco. On September 21, 2017, Evans posted the following photograph to Instagram, showing Russell at San Francisco's Japanese Tea Garden.



On October 19, 2017, a federal grand jury returned an indictment against Nadel. Approximately one week later, the FBI executed six search warrants in Manhattan, including at the defendant's residence. Nadel was arrested that same day at Washington Reagan National Airport before her plane took off for North Carolina.

## V.    THE INDICTMENT

On April 19, 2018, a grand jury returned a 13-count indictment against the Russell/Evans/Kaslov family. The following chart details the specific charges.

| Count | Offense | Defendants |
|-------|---------|-----------|
| 1 | Conspiracy to Commit Extortion, Bank Fraud & Wire Fraud (18 U.S.C. § 371) | Gina Rita Russell Tony John Evans Robert Evans Corry Blue Evans Archie Kaslov |
| 2 | Interference with Interstate Commerce by Extortion (18 U.S.C. § 1951(a)) | Gina Rita Russell Tony John Evans Robert Evans |
| 3 | Bank Fraud (18 U.S.C. § 1344(2)) | Gina Rita Russell Corry Blue Evans |
| 4 | Wire Fraud (18 U.S.C. § 1343) | Gina Rita Russell Corry Blue Evans |
| 5 | Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)) | Gina Rita Russell Tony John Evans Robert Evans Corry Blue Evans Archie Kaslov |
| 6 | Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity ("SUA")   (18 U.S.C. § 1957) | Archie Kaslov |
| 7 | Engaging in Monetary Transactions in Property Derived from SUA (18 U.S.C. § 1957) | Robert Evans |
| 8 | Engaging in Monetary Transactions in Property Derived from SUA (18 U.S.C. § 1957) | Archie Kaslov |
| 9 | Engaging in Monetary Transactions in Property Derived from SUA (18 U.S.C. § 1957) | Tony John Evans |
| 10 | Engaging in Monetary Transactions in Property Derived from SUA (18 U.S.C. § 1957) | Archie Kaslov Corry Blue Evans |
| 11-13 | Witness Tampering by Corrupt Persuasion/Misleading Conduct (18 U.S.C. § 1512(b)(3)) | Candy Evans Gina Rita Russell |

## VI.   POST-INDICTMENT PLEAS/SENTENCINGS OF CO-DEFENDANTS

Tony Evans, Robert Evans, Corry Evans, Archie Kaslov, and Candy Evans each resolved their cases via guilty pleas. The following chart summarizes information related to their cases.

| Defendant | Charge | Guidelines Range | Prison Sentence |
|---|---|---|---|
| Tony John Evans | 18 U.S.C. § 1951[4] | 57 to 71 Months | 60 Months |
| Robert Evans | 18 U.S.C. § 1951[5] | 57 to 71 Months | 60 Months |
| Corry Blue Evans | 18 U.S.C. § 1344[6] | 33 to 41 Months | 41 Months |
| Archie Kaslov | 18 U.S.C. § 371[7] | 30 to 37 Months | 30 Months followed by 6 months of home detention |
| Candy Evans | 18 U.S.C. § 1512(b)(3)[8] | 18 to 24 Months | 12 Months and 1 day followed by 6 months of home detention |

---

[4] Tony John Evans was the first family member who pleaded guilty. The government's decision to afford him the ability to plead to an offense where his sentencing range would be 57 to 71 months (Count Two) as opposed to one where he would face a recommended sentence of 97 to 121 months (Count Five) was deliberate. In fashioning the plea offer, the government considered the value of the information he provided to law enforcement during four voluntary debriefings while his counsel was present. The government also considered his voluntary surrender of additional gold bars and a luxury watch—none of which the government was likely to find without his assistance. He also agreed to the forfeiture of every item in his safe deposit box and arranged for the transfer of his Rolls Royce. Although his information was partially valuable, he also minimized his brothers and parents' involvement and grossly underestimated the amount of money he received.

[5] In requesting a 60-month sentence, the same sentence imposed against Tony Evans, the government noted that despite Robert Evans being slightly less culpable than Tony Evans, Robert Evans did not accept responsibility early. It took him three years to plead guilty. Moreover, he never met with the government, never took any steps to try to make the victim partially whole, and never provided the government with any useful information. Accordingly, the government requested the same sentence that Tony Evans received – 60 months' imprisonment.

[6] Corry Evans received a minor role adjustment.

[7] Kaslov pled guilty to a superseding information charging him with conspiracy to commit wire fraud. He received a minor role adjustment.

[8] The parties anticipated that Candy Evans' final guidelines range would be 12 to 18 months, but because of an aggravating role adjustment, her final range was 18 to 24 months.

## VII.    Russell's Plea Agreement & Additional Criminal Conduct

On July 30, 2019, Russell pled guilty to one count of interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951.

On May 16, 2024, the government filed a motion to have her bond revoked based on additional criminal conduct notably similar to the conduct that formed the basis of her guilty plea in this case. ECF No. 495. Specifically, while on release in California, the defendant convinced V1, a California resident, that Russell was a psychic who could help cleanse V1's negative energy. Russell charged V1 money to engage in the cleansing work. Just like she was with Nadel, Russell was initially kind and supportive of V1, but then convinced V1 to lie to her father, a Canadian physician, to get him to wire more than $180,000 to V1, the overwhelming majority of which V1 provided to the defendant. Russell also convinced V1 to engage in sex work for money and to give Russell the overwhelming majority of the proceeds. Russell also convinced V1 to lie to V1's clients to extract more money and prescription medications from them. V1 also purchased two cars that Russell and members of her family used. V1 provided Russell with a debit card to V1's Bank of America account, which allowed Russell direct access to V1's funds.

After the government filed its motion, it received surveillance images from Bank of America which confirmed that Russell and two members of her family used V1's debit card.



The Court granted the motion, which led to Russell's prompt arrest in Los Angeles and transfer to this district. The Court held a hearing on April 15, 2024, in which the defendant conceded detention. The Court found that there was probable cause that she committed a federal, state, or local crime while on release, and ordered her detained pending sentencing. ECF No. 513.

Although the government could charge the defendant in this jurisdiction with contempt, in violation of 18 U.S.C. § 401(3), for violating the conditions of her release, given that the defendant has lost the benefits outlined in Section 15 of her plea agreement and should not receive acceptance credit, the government has elected not to charge her with contempt.

## VIII.  SENTENCING GUIDELINES

The presentence investigation report properly calculated the defendant's guidelines as follows:

| | | |
|---|---|---|
| USSG §2B3.2(a) | Base Offense Level | 18 |
| USSG §2B3.2(b)(1) | Express or Implied Threat of Death, Bodily Injury, or Kidnapping | 2 |
| USSG §2B3.2(b)(2) /2B3.1(b)(7)(F) | Loss more than $3 million | 5 |
| USSG §2B3.2(b)(3)(B)(ii) | Demonstrated ability to carry out Threat of serious bodily harm | 3 |
| USSG §3B1.1(a) | Aggravating Role: Organizer/Leader | 4 |
| USSG §3C1.1 | Obstruction of Justice | 2 |
| | Total: | 34 |

PSR ¶ 92-103. Russell has no criminal history points; thus, she is in Criminal History Category I. PSR ¶ 106. The PSR correctly concluded that she should not receive acceptance of responsibility credit under USSG § 3E1.1 because she engaged in post-plea criminal conduct. PSR at 39; *see*

*e.g., United States v. Horn*, 635 F.3d 877 (7th Cir. 2011) (affirming district court's decision to deny acceptance credit when defendant committed additional fraud crimes after pleading guilty to mail fraud). Accordingly, her recommended guidelines range is 151 to 188 months' imprisonment. PSR ¶ 147.

## ARGUMENT

### IX.   THIS COURT SHOULD SENTENCE THE DEFENDANT TO 151 MONTHS' INCARCERATION

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the sentencing range under the guidelines, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(7).

#### A.   The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

Gina Rita Russell was the mastermind of an elaborate extortion, fraud, and money laundering scheme that caused Daniel Zancan to embezzle more than $4 million from his employer. The Honorable Emmet G. Sullivan, who presided over the case for more than four years, described it as one of the worst non-violent crime cases that he has seen in all his years on the bench. Russell and her ex-common-law spouse's family members engaged in the extensive scheme for one reason: greed. They did it so the family could live a lifestyle that they craved, but one that they did not earn. They wanted to buy expensive jewelry and cars. They wanted to take luxury vacations. They wanted to eat at fancy restaurants. They did not do it to pay for schooling or to

ensure that kids would avoid going hungry. Their conduct left lasting and devastating impacts on others. *See generally* Victim Impact Statements of Daniel Zancan (ECF No. 366-1 at 2-3), Hollie Nadel (ECF No. 365)[9], Nadel's Father (ECF No. 338 at 3), and Zancan's Former Employer (ECF No. 338 at 4). The nature and circumstances of this brazen conduct, which devastated lives, warrants a sentence within the guidelines.

### B. The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct

This case warrants a significant sentence to promote deterrence, both general deterrence and specific deterrence. The extortion, fraud, and money laundering scheme that was perpetrated over the course of several months included conniving and sinister ways to create the urgency and fear sufficient for Daniel Zancan to provide the Russell/Evans/Kaslov family members with approximately $4 million in cash and gold. The scheme included threats to Zancan's family, including his young children. The scheme included following Zancan's car and taking a photograph of it to convince him that he was being watched by the mafia. The scheme involved lying to a financial institution, i.e., PLS Check Cashing, about the source of Nadel's funds and the purpose of her withdrawals. The scheme involved excessive exuberance over obtaining the fraud proceeds and a total disregard for the scheme's impact on Zancan, his employers, and others. This conduct requires a stern penalty.

### C. The History and Circumstances of the Defendant

There is a troubling sense that members of the Russell/Evans/Kaslov families have been defrauding unwitting victims for years and that their excessive greed, as evidenced by the conduct

---

[9] The U.S. Probation Office plans to file an updated version of Nadel's letter prior to sentencing.

in this case, is what finally caught up to them. Russell has proven herself to be a complete menace to society, a true danger to any person unfortunate enough to believe that she has actual psychic ability. Russell is a master manipulator who has shown no genuine remorse for her horrific criminal conduct, no respect for the rule of law, and no intention of behaving in a law-abiding manner. She did not just mastermind the Zancan scheme, but also worked to defraud Nadel's father and V1. Although she certainly was raised in less than ideal circumstances and had an uphill battle given her upbringing, contrary to what Person A—yet another con artist—told the PSR writer, Russell does not have "the biggest heart in the world" and she is not "the most loving person." PSR ¶ 121. On the contrary, Russell has shown a complete lack of care for her fellow human beings—Hollie Nadel, Nadel's father, Daniel Zancan, Nadel's other clients like Zancan, V1, and every person who has been unlucky enough to cross paths with her for a psychic reading and bought in to her web of lies. There is no doubt that she is a danger to society. A sentence within the guidelines will protect the public from being further victimized for a lengthy period of time.

Although Russell's criminal conduct and behavior on supervision would justify a sentence at the top of the guidelines, i.e., 188 months, rather than ask for such a sentence, the government is requesting a sentence at the bottom of the guidelines, 151 months. That is a difference of approximately three years and would adequately factor in information that ordinarily would have been considered under Section 15 of the plea agreement.

### D.     The Need to Avoid Unwarranted Sentencing Disparities

The defendant is the final member of the Russell/Evans/Kaslov family to be sentenced. She was the mastermind of the scheme and warrants the most serious sentence. All four of her co-defendants who pleaded guilty to substantive charges related to the conspiracy, i.e., extortion, bank

fraud, or conspiracy to commit wire fraud, received sentences within their respective guidelines range, and only one of those four received a sentence at the bottom of the range. Just as sentences within the guidelines were appropriate for Tony John Evans, Robert Evans, Corry Blue Evans, and Archie Kaslov, a sentence within the guidelines is appropriate for Russell. Such a sentence would take into account her role as the scheme's mastermind, her overall history and circumstances, and her post-plea criminal conduct.

## X.   RESTITUTION AND FORFEITURE

The Court should order restitution in the amount of $4,217,542.86 as set forth in the presentence investigation report. See PSR ¶ 172. Pursuant to 18 U.S.C. § 3664(j)(1), the government requests that the judgment include an instruction that the two non-insurance company victims recover in full before the insurance company is paid. *See United States v. Baldwin*, 389 F. Supp. 2d 1, 4 (D.D.C. 2005) (concluding that in accordance with section 3664(j)(1), "all restitution must be made first to the direct victims of the fraud . . . before restitution can be made" to an insurance company that compensated a victim for its loss).

The government also requests that the Court enter an Amended Preliminary Order of Forfeiture and orally reference it at sentencing and incorporate the order of forfeiture into the judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court sentence Gina Rita Russell to 151 months of incarceration followed by three years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Kondi J. Kleinman*
       KONDI J. KLEINMAN, Cal. Bar No. 241277
       Assistant United States Attorney
       Fraud, Public Corruption & Civil Rights Section
       601 D Street, N.W. | Washington, D.C. 20530
       (202) 252-6887 | Kondi.Kleinman2@usdoj.gov